IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF Z'MAYA J.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF Z'MAYA J., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

ARNETIA J., APPELLANT, AND SARA J., APPELLEE AND CROSS-APPELLANT.

Filed April 5, 2022.    No. A-21-696.

Appeal from the Separate Juvenile Court of Douglas County: CANDICE J. NOVAK, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Claudia L. McKnight for appellant.

Nathan Klein, Deputy Douglas County Attorney, and Traemon Anderson, Senior Certified Law Student, for appellee State of Nebraska.

Monica Green Kruger for appellee Sara J.

Jamie Hermanson, of Hermanson Law & Mediation, guardian ad litem.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Arnetia J. appeals from the decision of the separate juvenile court of Douglas County terminating her parental rights to her daughter, Z'Maya J., who had been removed from Arnetia's care shortly after birth. Arnetia's mother, Sara J., cross-appeals the juvenile court's decision to dismiss her motion for placement of Z'Maya. We affirm.

- 1 -

## BACKGROUND

### PROCEDURAL BACKGROUND

Arnetia, now age 28, is the biological mother of Z'Maya, born in November 2017. Arnetia, who had previously been diagnosed with schizophrenia and bipolar disorder, purportedly did not have any prenatal care during her pregnancy until she was 28 weeks pregnant. Z'Maya was removed from Arnetia's care shortly after her birth, before the two of them were to be released from the hospital. There were concerns about Arnetia's mental health, as well as concerns that she had stopped taking her prescribed medications, had been using illegal drugs, and was living out of her car.

Z'Maya's biological father was not definitively identified, was not part of Z'Maya's life, and was not part of the juvenile proceedings below; accordingly, he will not be discussed further.

The State filed a petition on November 27, 2017, and an amended petition on April 4, 2018, alleging that the juvenile fell within Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The original petition stated the juvenile's name was "Zariah J[.]" whereas the amended petition stated the juvenile's name was "Z'Maya J[.]" The State alleged: Arnetia's use of controlled substances placed Z'Maya at risk for harm; Arnetia failed to provide proper parental care, support and/or supervision for Z'Maya; Arnetia failed to provide safe, stable housing for Z'Maya; and for the above reasons, Z'Maya was at risk for harm. The same day the initial petition was filed, the State also filed a motion for temporary custody of Z'Maya to be placed with the Nebraska Department of Health and Human Services (DHHS), and the juvenile court entered an ex parte custody order that same day. Z'Maya has since remained in the custody of DHHS and in foster care.

In an order entered on December 4, 2017, a guardian ad litem was appointed to represent Arnetia. Arnetia was ordered to cooperate with family support worker services, undergo a psychological evaluation with a parenting assessment and sign a release of information so that DHHS could obtain the results, submit to random drug testing, and release her psychiatric records to DHHS/Nebraska Families Collaborative. Additionally, Arnetia was to be allowed reasonable rights of agency-supervised visitation.

Arnetia failed to appear for the adjudication hearing on February 12, 2018, and the matter was continued to April 4. The contested adjudication hearing was held on April 4, with Arnetia present. The juvenile court found that the allegations of the amended petition were true by a preponderance of the evidence and adjudicated Z'Maya as being within the meaning of § 43-247(3)(a). The matter proceeded to immediate disposition and the court ordered Arnetia to participate in and successfully complete individual therapy, undergo a parenting assessment, cooperate with family support worker services, take all medications as prescribed by her attending physician, and be allowed reasonable rights of agency-supervised visitation.

Following a continued disposition and permanency planning hearing on May 22, 2018, Arnetia was also ordered to: continue to meet with her psychiatrist on a regular basis for medication management and take all medications as prescribed; participate in "Community Alliance Day Programming" a minimum of 3 days per week; participate in and successfully complete a parenting course related to age appropriate parenting skills and safe practices; enroll and participate in an educational course and/or support group to address the dangers of prescription medications; maintain a safe, clean, and adequate home environment, to include establishing a stable lifestyle;

undergo a chemical dependency evaluation; and abstain from the use of illegal drugs, including marijuana.

Following a review and permanency planning hearing in November 2018, Arnetia was additionally ordered to participate in and successfully complete "Level 1 Chemical Dependency Outpatient Therapy" and submit to random drug and alcohol testing. An order entered following a May 2019 review and permanency planning hearing required Arnetia to "[r]emain actively engaged" with individual therapy to address her mental health and substance abuse issues.

On October 2, 2019, the State filed a motion to terminate Arnetia's parental rights to Z'Maya pursuant to Neb. Rev. Stat. § 43-292(2), (5), (6), and (7) (Reissue 2016). But subsequently, on December 12, 2019, the State moved to dismiss that motion and the following day, the State's motion to dismiss was sustained by the juvenile court.

On October 27, 2020, Arnetia's mother, Sara, filed a complaint for leave to intervene in the juvenile proceedings. The juvenile court granted Sara's complaint on December 9.

On December 14, 2020, the State filed a second motion to terminate Arnetia's parental rights to Z'Maya pursuant to § 43-292(2), (5), (6), and (7). The motion alleged as follows: Arnetia substantially and continuously or repeatedly neglected and refused to give Z'Maya or a sibling of Z'Maya necessary parental care and protection; Arnetia was unable to discharge parental responsibilities because of mental illness or mental deficiency and there were reasonable grounds to believe that such a condition would continue for a prolonged indeterminate period; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication of the child under § 43-247(3)(a); Z'Maya had been in an out-of-home placement for 15 or more of the most recent 22 months; and termination of Arnetia's parental rights was in Z'Maya's best interests.

On March 30, 2021, Sara filed a motion for change of placement asking the juvenile court for an order placing Z'Maya with her in her home.

TERMINATION HEARING

A hearing on the motion to terminate Arnetia's parental rights was held on March 31, April 1, and May 13, 2021. Numerous witnesses testified and several exhibits were received into evidence. A summary of the relevant evidence follows.

In May 2016, a Kansas court terminated Arnetia's parental rights to three other children (born in 2012, 2013, and 2014). The court found that Arnetia was "unfit by reason of conduct or condition which rendered [her] unable to care properly for a child, and said conduct or condition is unlikely to change in the foreseeable future for the following reasons": "Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unlikely to care for the ongoing physical, mental and emotional needs of the child[.]" "[P]hysical, mental or emotional neglect of the child[.]" "Excessive use of narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical mental or emotional needs of the child[.]" "[R]easonable efforts by appropriate public or private child caring agencies have been unable to rehabilitate the family[.]" "[L]ack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child[.]" "[A]nd the children are not in the physical custody of the parent and the parent has . . . failed to carry out a reasonable plan approved by the court directed toward the integration of

the child into the parental home[.]" The court also found that termination of Arnetia's parental rights was in the children's best interests. The record before us also indicates that, at some point, Arnetia's parental rights were terminated to a fourth child as well; it appears the fourth child was younger than the three children mentioned above, but older than Z'Maya.

In 2017, prior to Z'Maya's birth, the Sarpy County Probate Court appointed Sara as Arnetia's guardian. It its order, the probate court found that the appointment of a guardian was necessary because Arnetia "lacks sufficient understanding and capacity to make or communicate responsible decisions concerning her person and her estate." Sara remained Arnetia's guardian throughout this current juvenile case.

Megan Miller has been the case manager assigned to this case since September 2019. She was employed with Saint Francis Ministries and was previously employed with Nebraska Family Collaborative/PromiseShip. According to Miller, cases are referred by DHHS after a removal and then assigned to various case managers, depending on who has openings. Miller testified that Z'Maya was removed near the time of her birth and became a state ward in November 2017 because it was reported that Arnetia admitted to marijuana use, Z'Maya tested positive for "benzos," and there were concerns about Arnetia's mental health and housing.

Dr. Theodore DeLaet, a psychologist, testified that he completed three forensic adult psychological and parenting risk assessments of Arnetia--one in 2018, one in 2019, and one in 2020; all three of his assessment reports were received into evidence. He stated that "[a]cross all the parenting evaluations" "it's rare to evaluate somebody twice," and "this may be the only case that I've evaluated three different times." The benefit of being able to reassess multiple times is that "you can look for issues that emerged at the first evaluation, and . . . see if they get better and/or have gone away," "[w]e look for things that are well managed," and "[w]e also look for new problems that weren't evident the first time that are now relevant to the current assessment." "So having repeated measures, particularly over something such as in this case where we had a three year period, it adds more confidence or power to the findings because you have three different assessments that you can sort of contrast and compare[.]"

In his August 2018 report, Dr. DeLaet's diagnostic impression of Arnetia was that she met the following diagnostic criteria: "Unspecified Schizophrenia Spectrum and Other Psychotic Disorder"; "Rule-Out" "Schizoaffective Disorder, Bipolar Type"; "Attention-Deficit/ Hyperactivity Disorder, Combined Type"; "Rule-Out" "Specific Learning Disorder (by History)"; "Cannabis Use Disorder, Moderate"; "Methamphetamine Use Disorder, Moderate"; "Cocaine Use Disorder, Severe"; and "Child Neglect, Confirmed, Subsequent Encounter." Dr. DeLaet rated Arnetia at "Moderate - High Risk to have Future Problems with Child Maltreatment" and "Moderate - High Risk to be Unable to Care for Her Child." He found that she had "poor insight into her life situation, how to manage herself, etc.," "[h]er compliance with treatment and being able to maintain sobriety has been poor," and "[s]he is on disability and requires a Guardian ad Litem and a temporary legal guardian to function independently." In his recommendations, Dr. DeLaet stated:

> []. This writer recommends to the court and others involved with this case to take extreme caution in working with [Arnetia]. Multiple accommodations would be needed to help her to function at her best. Her compliance will need to be externally monitored for medications, treatment compliance, etc. She is likely to receive limited benefit from such

things as parenting education classes. Any comprehension or skill building intended from such an intervention will need to be separately assessed as simply showing up to the meetings does not guarantee competence or learning.

[]. Underlying success factors for [Arnetia] will be maintaining her mental health and also staying sober. She has extensive histories of problems sustaining either or both. These are primary risk factors for her.

In his September 2019 report, Dr. DeLaet's diagnostic impression of Arnetia remained unchanged from the previous evaluation. He noted that Arnetia "appears to be more stable than she was at the initial evaluation," that she had completed a substance use program and was sober, and she appeared to be compliant with her medications. However, Arnetia "has significant social support and external supervision" and "has accomplished little in the way of establishing she can maintain herself without this supervision and support." Dr. DeLaet concluded that Arnetia's parenting risk factor could be reduced to "Moderate" at the time of his evaluation. He noted that Arnetia "continues to have poor insight," "[h]er denial and overconfidence are areas of concern that she believes she is doing better than she actually is," and "[s]he remains on disability for her mental illness and requires a Guardian ad Litem and legal guardianship to function at the present time." In his recommendations, Dr. DeLaet stated:

[]. This writer recommends to the court and others of continued extreme caution in working with [Arnetia] and reunification with her daughter. This writer notes that the case is over another year from the initial time of assessment. [Arnetia] requires multiple accommodations and social service support to function. The gradual removal of these supports to determine her true capability of parenting independently has not been done. It appears the length of the visits have increased but there is nothing to independently measure her ability to do things without supervision or support.

[]. A prerequisite for being able to parent at her best will be ongoing management of her mental health and sobriety. Her relapse for both remains high based on history. She is doing better now with extensive support. Again, her ability to maintain these gains if support is removed is an active concern.

In his July 2020 report, Dr. DeLaet's diagnostic impression of Arnetia remained unchanged from the previous evaluations. He noted that Arnetia "is functioning better now than in the 2018 evaluation only through external support and guidance from others." He rated Arnetia at "Moderate Risk to Engage in Future Child Maltreatment." Arnetia "is using fewer substances than before but her substance use continues to be a problem," and her "mental health stability appears to be improved since going to an intramuscular shot that she gets once a month." In his recommendations, Dr. DeLaet stated:

[]. This writer recommends continued psychiatric medication management and continued therapy support.

[]. This writer continues to recommend that sobriety should be the behavioral expectation related to [Arnetia's] substance use.

[]. This writer concludes and recommends to the court and other interested parties . . . of the importance of the fact that [Arnetia] requires a legal guardianship for herself.

This contraindicates her ability to be the legal guardian for any other person, to include her daughter Z'Maya. . . .

[]. Because [Arnetia] is a vulnerable adult, the apparent current goal of unsupervised visitations with her daughter is contraindicated. Continued supervised visits is recommended based on the vulnerable adult principle.

Dr. DeLaet testified that "[s]chizophrenia and schizoaffective disorder are referred to as persistent or ongoing things, and so the goal is to manage them, so that it doesn't interfere significantly with how the person's trying to live their life"; it is a "life-long diagnosis." Dr. DeLaet's reports state that Arnetia had "a total of about six psychiatric hospitalizations," including "two in 2018." He stated that Arnetia reported that Z'Maya was removed from her "'due to the prior cases in Kansas'"; Arnetia's reported reason was inconsistent with the other reports, like the affidavit for removal, that Dr. DeLaet received.

Dr. DeLaet believed that Arnetia had "some abilities" to parent, but he had "significant concerns" about her ability to independently parent. A significant factor was that Arnetia needed a legal guardian, "because if someone cannot be their own legal guardian how could they possibly be an independent guardian for any other person[.]" Arnetia "can certainly provide dependent care where she's supervised, something like that, much like a babysitter, child care provider as a teenager, they can provide care safely for a child, but they are not considered the child's legal guardian and making other legal guardian type decisions."

Dr. DeLaet stated that the last time he saw Arnetia was in July 2020 and at that time she "was at moderate risk" to engage in future child maltreatment. He stated that "[l]ow risk would be the best," but he "[did not] see low risk as ever being a realistic goal." He believed "the best case scenario for her would be that she could get to the low moderate [parenting risk range], but I don't think she could ever get to low" because "[s]he has too many risk elevation factors such as the schizoaffective disorder, the substance use history, the learning disorder, and so forth"; "I think low moderate would be the best that she could get if she's at her maximum potential." He said that "low moderate would be verification of sobriety, making sure she's complying with her medications and appointments," but that the guardianship "becomes a very large issue" for the reason stated previously. He did not know what, if any, progress Arnetia had made since he last saw her in July 2020.

Georgia Rhoades-Richardson, a licensed independent mental health practitioner and addiction counselor, testified that Arnetia was referred for therapeutic services in July 2018 because her child had been removed, there was a history of some drug use, and she had schizoaffective disorder, bipolar type. In 2018, Arnetia attended a 12-week group therapy that was based on relapse prevention. She was able to achieve her goal of relapse prevention.

Rhoades-Richardson has also been providing individual therapy to Arnetia every other week since July 2018. Arnetia attended 42 out of 67 scheduled therapy sessions; some reasons for missed appointments were that she overslept, had another appointment scheduled at the same time, or had a visit with her daughter that coincided with a therapy appointment. During Arnetia's individual therapy, they discuss "her moods, her emotions, her week, how it's been, her visits with her daughter," and they discuss her progress on the goals that Saint Francis Ministries set up for her. According to Rhoades-Richardson, the goals set by Saint Francis Ministries were for Arnetia

to attend therapy appointments, attend all visits with her daughter, obtain her driver's license, start attending college to get her GED, complete "Community Alliance," remain sober, and have clean "UAs." Rhoades-Richardson stated that transportation was "a very large" barrier identified by Arnetia, as was sleep. Arnetia "had a hard time going to sleep and then getting up in the morning" which at times was a barrier to her getting to visits or to appointments. According to Rhoades-Richardson, Arnetia obtained her driver's license in 2020, and tried to maintain a healthy sleep schedule, but occasionally still struggled. Arnetia was able to achieve her goals related to relapse prevention and medication management. Rhoades-Richardson's last appointment with Arnetia was at the end of February 2021; she did not see Arnetia throughout the month of March, and Arnetia did not give her a reason for not attending therapy during that time.

When asked if she believed Arnetia had reached maximum benefit of cognitive behavioral therapy, Rhoades-Richardson replied, "I don't know that there's anything else that we can do with cognitive behavior therapy, yes." She was asked what other programming or services she would recommend to address Arnetia's unmet goals. Rhoads-Richardson replied, "I believe that she would benefit from having a case worker out in the community to help her with questions she might have about just normal life situations."

At some point in 2019, Rhoades-Richardson recommended that Z'Maya be placed back in Arnetia's home with wraparound services. When asked what services she had identified that would have been helpful to Arnetia, Rhoades-Richardson stated that there was a program that had "a lot of community support work that comes in and helps a client just maintain regular activities, checks on, again, medication management, any use of substances." At that time, it was Rhoades-Richardson's opinion that Arnetia would be able to successfully care for her child with those services in place. Rhoades-Richardson confirmed that Arnetia's progress in therapy had continued to improve since she made that recommendation. When asked if she still had the same opinion, Rhoades-Richardson stated, "I know that she could successfully be on her own with wrap-around services," "[s]ome sort of support system that was ongoing and permanent, yes." The State clarified by asking, "So your testimony today is not that you feel comfortable placing the child with her with those services, just that you believe that she could have some degree of independence with those permanent wrap-around services?" Rhoades-Richardson replied, "Yes."

The DHHS court reports also give insight into Arnetia's progress throughout this case. According to the November 2019 DHHS court report, in the past 6 months, Arnetia had missed several psychiatric appointments and had not always taken her medications, she completed 39 out of 50 requested drug tests, and she was discharged from family support services in June due to no participation. Arnetia was offered two 4-hour visits per week, but she had "missed several visits over the last month or so." "Fair progress is being made to alleviate the causes of out-of-home placement."

According to the March 2020 DHHS court report, Arnetia had clean drug tests and had not tested positive for any illegal substances during that reporting period. It was noted that Arnetia "randomly tests presumptive positive for benzo's and methamphetamines, which come back negative from the lab." Arnetia had three supervised visits per week for 3 to 4 hours per visit; she had been consistent with her visits and had not missed any visits. It was recommended that Arnetia begin a slow transition toward unsupervised visits, with family support in place to help monitor safety and parenting skills during transition. "Good progress is being made to alleviate the causes

of out-of-home placement." However, the juvenile court did not order a transition to unsupervised visitation at that time.

According to the September 2020 DHHS court report, Arnetia was offered two visits per week for 3 hours per visit. Visits were held via "video chat" or in a neutral location because of the COVID-19 pandemic. During the reporting period, Arnetia was a "no show" for three visits in April, six visits in May, and one visit in July. There were no immediate safety threats or concerns on visits, but it was recommended that agency supervised visits continue because there were still concerns about Arnetia's ability to parent and keep Z'Maya safe without having someone supervising her visits. Additional recommendations were to continue agency supervised visitation with a transition to unsupervised visitations. The report states that as of July, "A majority of Arnetia's drug tests have come back clean, however her April 2020 sweat patch came back positive for THC, about 3x more than the threshold value. Her test in May 2020 was negative." In August, Arnetia reported to the case manager that she stopped taking her medications for her psychiatric conditions about 6 months ago because she did not like how the medications made her feel, but she did not report this to the team. "Good progress is being made to alleviate the causes of out-of-home placement." Case manager Miller testified that DHHS made the recommendation to transition towards unsupervised visits because the prior motion to terminate Arnetia's parental rights had been dismissed, but the juvenile court did not order the transition.

According to the February 2021 DHHS court report, "Arnetia may not complete every [drug] test, but she has not had a positive UA during the last several reporting periods." Arnetia was offered two visits per week for 3 to 4 hours per visits. Arnetia attended all visits and there were no noted safety concerns. The report states:

> At this time, while Arnetia has made progress with maintaining her visit schedule and continues to participate in all of her court ordered services, Saint Francis Ministries would not be in support of liberalizing visitation. CM Miller wants to ensure the court understands, Arnetia has made great progress with her own personal growth over the last few years and CM Miller wants to commend Arnetia for this. Despite her own growth, Saint Francis Ministries does not believe that Arnetia has the ability to care for Z'Maya without being supervised ongoing. Arnetia[] has her legal guardian, her mother, Sara . . . . Sara . . . has been deemed inappropriate by DHHS/Saint Francis Ministries and the GAL to have unsupervised contact with Z'Maya. Due to this guardianship, DHHS/Saint Francis Ministries does not believe Z'Maya would be safe if returned to this home. Arnetia and her mother have a strained and volatile relationship at times, which has been observed and documented by many providers. Providers have also reported that Sara encourages Arnetia to lie about her mental health etc., which has been a pattern for many years and directly related to the intake that brought Z'Maya into [c]are.

The report also states:

> [Rhoades-Richardson] has reported to CM Miller in the past that Arnetia's mother, Sara . . . , has been a barrier for Arnetia in the past. Sara has reportedly asked [Rhoades-Richardson] to lie to DHHS/SFM/PromiseShip so that Arnetia could get Z'Maya back. [Rhoades-Richardson] has expressed a lot of concerns about Sara . . . and [Sara's] mental health.

(We note that the November 2017 affidavit for removal states that Arnetia "is schizophrenic and bipolar, as is [her] mother, Sara." And Dr. DeLaet's 2018 report states that Arnetia disclosed that her mother has been diagnosed with Schizophrenia and Bipolar Disorder.) The February 2021 DHHS report noted that "[g]ood progress is being made to alleviate the causes of out-of-home placement." The recommendation was to continue agency supervised visitations.

Miller testified that Arnetia was communicative and cooperative with her and she attended family team meetings. Arnetia was not employed, but she received "SSI," and she had housing through "OHA." Arnetia was participating in individual therapy with Rhoades-Richardson, but had not successfully completed therapy. Miller stated, "Typically we like to see parents complete their mental health therapy successfully, not necessarily before reunifying, but we like to have that provider weigh in on reunification, as well." On cross-examination, Miller was asked if completion of therapy was a necessary component for a parent to reunify with their child or if it could be ongoing. Miller replied, "It can be ongoing."

Miller stated that Arnetia currently had two agency supervised visits per week in her home. She had not missed a visit in 4 to 5 months, but the visitation provider had not indicated that it would be able to accommodate increasing the number of weekly visits. When asked if it was typical to not offer more visits if an agency cannot provide more days, Miller responded, "I wouldn't say typical, no." When asked why Arnetia had not been offered additional visits if she had been consistent for 4 to 5 months, Miller replied, "I think that pending TPR also probably affected that . . . I don't necessarily have a good answer right now."

Arnetia never progressed to unsupervised visits. According to Miller, "If we don't see case progression regarding agency supervised visits to unsupervised visits, that . . . influences the length of time the child is in care because we need the specific timelines for parents to go from agency supervised to unsupervised, and then we slowly transition to placement." Miller had not recently received any information from anyone about issues on visits; back in September 2019, Miller received reports that Arnetia struggled to stay awake on visits and there were "a couple of incidents" where Z'Maya had found items on the floor and put them in her mouth, which was a safety concern. Miller had reviewed all the visitation summaries for the 6 months prior to the termination hearing and she had no safety concerns from those summaries.

Z'Maya's foster mother testified that Z'Maya has been in her care since November 2017. Z'Maya's visits with Arnetia had "gone up and down" during the case, but they currently had visits 2 days per week, for 3 hours per visit. According to the foster mother, Z'Maya has been potty trained for a year, but for the past 2 to 3 months, she has been "wetting her pants" every afternoon following a visit with Arnetia. In the evenings on visitation days, "[Z'Maya's] more agitated, she's fussier, her schedule's been disrupted."

Miller testified that Arnetia lived with her mother, Sara, who is Arnetia's legal guardian. Arnetia struggled to maintain her personal appointments and her mother, as guardian, helped her schedule and attend appointments. During family team meetings, ideas were discussed regarding different ways to help Arnetia remember appointments, such as setting an alert on her phone or having a specific calendar for her appointments, but it continued to be a struggle. When Sara was out of town in January 2021, Arnetia missed a therapy appointment and did not reschedule, and she also missed a visit but was allowed to make up that visit. According to Miller, a parent's ability to maintain appointments is important to assessing parental fitness because "[i]f a parent struggles

to maintain their own appointments, it would be very hard for them to also maintain a child's appointments, as well, whether it be medical appointments or mental health or school." Miller stated, "Typically what we like to see for classifying someone as a fit parent is the ability to maintain safety, well-being, and nurturing children, that includes making sure that their medical appointments are up to date, their education needs and emotional needs are being met, which also includes coordinating and communicating with all of their providers." In forming her opinion about Arnetia's ability to parent, Miller considered whether Arnetia could "parent independently," "make her own decisions regarding financial, medical, monetary," and "maintain a consistent schedule." Miller was also aware that Arnetia had her parental rights terminated to four other children in other states, and that factored into her opinion about what was in Z'Maya's best interests.

At the time of the termination hearing, Z'Maya had been placed out of Arnetia's home for over 3 years. Miller stated, "We haven't progressed to unsupervised or overnight visits at this point," and "[t]here are still concerns regarding mental health and the ability to care for Z'Maya." "Specifically to Arnetia, her diagnoses are what resulted in her guardianship, which creates a barrier for permanency, meaning that she isn't able to fully take care of herself, let alone a minor child." Miller was asked, "And is it your testimony that as long as those conditions exist, she is not going to be able to parent her child?" Miller responded, "Correct." Miller opined that it would be in Z'Maya's best interests to terminate Arnetia's parental rights.

JUVENILE COURT'S DECISION

In an order filed on July 30, 2021, the juvenile court found by clear and convincing evidence that statutory grounds for termination existed pursuant to § 43-292(2), (5), and (6). The court also found that termination of Arnetia's parental rights was in Z'Maya's best interests. The court terminated Arnetia's parental rights to Z'Maya, but ordered that supervised visitation could continue pending appeal. In a separate order filed on July 30, the court stated that Sara's motion for change of placement was dismissed for lack of standing.

Arnetia appeals, and Sara cross-appeals.

ASSIGNMENTS OF ERROR

Arnetia assigns, restated, that the juvenile court erred in finding that statutory grounds existed to terminate her parental rights pursuant to § 43-292(2), (5), (6), and (7) and in finding that termination of her parental rights was in Z'Maya's best interests.

Sara assigns on cross-appeal that the juvenile court erred in dismissing her motion for change of placement for lack of standing.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

In its motion, the State sought to terminate Arnetia's parental rights under § 43-292(2), (5), (6), and (7). The juvenile court found § 43-292(2), (5), and (6) existed by clear and convincing evidence. The court's order was silent as to § 43-292(7).

There was clear and convincing evidence that the 15-out-of-22 months' formula of § 43-292(7) existed as a statutory basis for terminating Arnetia's parental rights to Z'Maya. However, because the juvenile court's order was silent as to § 43-292(7), we will focus our analysis on an alternate ground for termination.

Section 43-292 states:

> The court may terminate all parental rights between the parents or the mother of a juvenile born out of wedlock and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:
>
> . . . .
>
> (2) The parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection.

Past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in a parental rights termination case under § 43-292(2). *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

Less than 2 years prior to Z'Maya's birth, Arnetia had her parental rights terminated to her four older children. Arnetia's parental rights to her three older children were terminated by a Kansas court, in part because of her physical, mental, or emotional neglect of the children, and in part because of her lack of effort to adjust her circumstances, conduct, or conditions to meet the needs of the children. Although the circumstances are unknown, Arnetia's parental rights to a fourth child were also terminated. Subsequently, Z'Maya was adjudicated in this juvenile case in part because Arnetia failed to provide proper parental care, support and/or supervision for her, and because Arnetia failed to provide safe, stable housing for her. Accordingly, Arnetia has substantially and continuously or repeatedly neglected and refused to give Z'Maya or a sibling of Z'Maya necessary parental care and protection.

The State has shown clearly and convincingly that § 43-292(2) exists as a statutory basis for terminating the parental rights of Arnetia. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning the other statutory bases for termination. *In re Interest of Mateo L. et al., supra.*

Furthermore, we note that because we do not consider whether termination of parental rights was proper pursuant to § 43-292(6), Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2020), which requires reasonable efforts to reunify families, it is not applicable to the instant case. Section 43-283.01 is only incorporated into § 43-292(6), not into the remaining subsections of § 43-292. See *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). See, also, *In re*

*Interest of Mateo L. et al., supra* (reasonable efforts to reunify family required under juvenile code only when termination is sought under § 43-292(6)). We next consider whether termination is in Z'Maya's best interests.

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, less than 2 years prior to Z'Maya's birth, Arnetia had her parental rights terminated to her four older children. Although the circumstances are unknown as to why Arnetia's parental rights were terminated as to one of those children, the Kansas court records reveal that Arnetia's mental health, drug use, and neglect of the children were all concerns regarding three of Arnetia's older children. Those same issue were present in the current juvenile case.

While Arnetia has made progress regarding her substance use and other court-ordered services, there are still concerns about her mental health. Dr. DeLaet testified that schizophrenia and schizoaffective disorder are lifelong diagnoses. And the record is clear that Arnetia needs extensive, continued support services to function independently. The Sarpy County Probate Court appointed Sara to be Arnetia's guardian in 2017 because Arnetia "lacks sufficient understanding and capacity to make or communicate responsible decisions concerning her person and her estate." Sara remained Arnetia's guardian throughout this case.

At the time of the termination hearing, Rhoades-Richardson said there was nothing else she could do in terms of cognitive behavior therapy for Arnetia. Rhoades-Richardson believed that with permanent wraparound services, Arnetia could have some degree of independence, but that did not mean that Rhoades-Richardson would feel comfortable placing Z'Maya with Arnetia with those services in place. Dr. DeLaet believed that Arnetia had "some abilities" to parent, but he had "significant concerns" about her ability to independently parent. When Dr. DeLaet last saw Arnetia in July 2020, she "was at moderate risk" to engage in future child maltreatment. He stated that "[l]ow risk would be the best," but he "[did not] see low risk as ever being a realistic goal," and that "low moderate would be the best that [Arnetia] could get if she's at her maximum potential." A significant factor was that Arnetia needed a legal guardian. He said Arnetia "can certainly provide dependent care where she's supervised, something like that, much like a babysitter[.]"

Arnetia did not progress to unsupervised visits. Although Rhoades-Richardson and Miller previously recommended transitioning to unsupervised visits, by the time of the February 2021 DHHS report, transitioning to unsupervised visits was no longer recommended by Miller. Despite Arnetia's growth, Saint Francis Ministries believed that she did not have the ability to care for Z'Maya without ongoing supervision. Arnetia lived with Sara, her legal guardian, and Sara had been deemed inappropriate to have unsupervised contact with Z'Maya. Thus, DHHS and Saint Francis Ministries did not believe Z'Maya would be safe if returned home. It was noted that providers observed and documented a strained and volatile relationship between Arnetia and Sara, and providers also reported that Sara encouraged Arnetia to lie about her "mental health etc." There were also concerns about Sara's mental health, as she also had reportedly been diagnosed with Schizophrenia and Bipolar Disorder. Miller opined that it would be in Z'Maya's best interests to terminate Arnetia's parental rights.

The juvenile court found that it was in the best interests of Z'Maya that Arnetia's parental rights be terminated. We agree. Z'Maya had been out of Arnetia's home for over 3 years at the time of the termination hearing. Z'Maya deserves permanency. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. The State proved that Arnetia was unfit, meaning that she has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to Z'Maya's well-being. See *In re Interest of Leyton C. & Landyn C., supra*. We further find that there is clear and convincing evidence that it is in Z'Maya's best interests to terminate Arnetia's parental rights.

### SARA'S CROSS-APPEAL

Sara assigns on cross-appeal that the juvenile court erred in dismissing her motion for change of placement for lack of standing. However, in her brief, Sara concedes that her claim hinges on this court's reversal of the termination of Arnetia's parental rights to Z'Maya. Because we have not reversed the termination of Arnetia's parental rights, we need not address Sara's cross-appeal regarding her motion for change of placement.

### CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Arnetia's parental rights to Z'Maya. We also affirm the court's dismissal of Sara's motion for placement of Z'Maya.

AFFIRMED.